[Cite as *State v. Thompson*, 2026-Ohio-1725.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 24AP-92 (C.P.C. No. 23CR-656) |
| | | & |
| v. | : | No. 24AP-104 (C.P.C. No. 22CR-3408) |
| Damon M. Thompson, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on May 12, 2026

**On brief:** *Shayla D. Favor*, Prosecuting Attorney, and *Michael A. Walsh*, for appellee. **Argued:** *Michael A. Walsh*

**On brief:** *W. Joseph Edwards*, for appellant.

APPEALS from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Damon M. Thompson, appeals from judgments of conviction and sentence entered by the Franklin County Court of Common Pleas. For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} This consolidated appeal arises from two separate criminal proceedings against Thompson. Because the proceedings were based on different underlying incidents, we will summarize the facts and procedural history of each proceeding individually.

### A. Failure to comply with an order of a police officer

{¶ 3} In Franklin County Common Pleas Court case No. 22CR-3408, Thompson and Mytaiza Gordon were indicted on one count of failure to comply with an order or signal of a police officer, a third-degree felony in violation of R.C. 2921.331, for operating a motor

vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the vehicle to a stop.  The indictment further alleged that operation of the motor vehicle caused a substantial risk of serious physical harm to persons or property or was a proximate cause of serious physical harm to persons or property.

{¶ 4}  Thompson was tried on the charge in case No. 22CR-3408 in July 2023, but the jury was unable to reach a verdict and a mistrial was declared.  The case was retried in August 2023.

{¶ 5}  At the retrial, Whitehall Police Detective Dustin Willis[1] testified that while on patrol on May 27, 2022, he observed a vehicle fail to stop at a four-way stop sign.  Detective Willis initiated a traffic stop of the vehicle; it took approximately 30 seconds for the vehicle to come to a stop after Detective Willis activated his lights.  Detective Willis testified that in his experience a delay in coming to a stop indicates something is happening inside the vehicle, which might include concealing contraband.  Detective Willis approached the vehicle and spoke with Gordon, who was in the driver's seat.  Detective Willis testified that he detected an odor of burnt marijuana while speaking with Gordon.  There was a child in the back seat of the car and Thompson was in the passenger seat.  Thompson told Detective Willis he did not have his identification card but showed Detective Willis a photograph of it.

{¶ 6}  Whitehall Police Officer Tyler King arrived as backup and Detective Willis asked Thompson to exit the vehicle, with the intention of further investigating the burnt marijuana odor.  After Thompson exited the vehicle, Officer King asked him if he had any weapons.  Detective Willis testified that Thompson "then immediately jumped back into the car and yelled, 'Go! Go! Go!' "  (Aug. 22, 2023 Tr. at 55.)  The vehicle then sped away from the initial traffic stop location.  After determining that the occupants of the vehicle were not subject to outstanding warrants, Detective Wills decided not to pursue at high speed because the road was wet.

{¶ 7}  Detective Willis then drove his police cruiser in the direction that the vehicle had fled.  After driving for a short time, he saw that the vehicle had crashed into a telephone pole and come to rest in the street.  By the time Detective Willis arrived, Thompson had fled

---

[1] At the time of the incident leading to the charge in case No. 22CR-3408, Detective Willis was a patrol sergeant but for purposes of this decision we refer to the position he held at the time of his trial testimony.

the scene, and Gordon was attempting to get the child out of the vehicle. Detective Willis saw that the airbags in the vehicle had deployed due to the crash. After securing Gordon and the child in Detective Willis's cruiser, officers searched the area for Thompson but were unable to find him.

{¶ 8} Portions of Detective Willis's body camera video and cruiser dash camera video were played for the jury. In the body camera video, Thompson can be seen stepping out of the vehicle and then immediately jumping back in saying "go, go, go." Thompson closes the door of the car while Gordon drives away. Detective Willis gets back into his cruiser to follow and approximately one minute later arrives at the crash location. Damage to the front of the vehicle was apparent as Detective Willis approached it on foot after exiting his cruiser. In the dash camera video, pieces of broken utility pole can be seen in the roadway as Detective Willis's cruiser approaches the crash location.

{¶ 9} Whitehall Police Officer Kyle Schneider responded to the report of the fleeing vehicle and observed the crash site and the broken telephone pole. He conducted an inventory search of the vehicle after determining it would need to be towed away due to the damage it sustained. While conducting the inventory search of the vehicle, Officer Schneider found Thompson's Ohio identification card on the trunk ledge.

{¶ 10} Thompson did not testify in his own defense and did not present any other witnesses. The jury found Thompson guilty of failure to comply with an order or signal of a police officer. The verdict included a finding that the vehicle was operated so as to willfully elude or flee a police officer after receiving a visible or audible signal to bring the vehicle to a stop and a finding that the operation of the vehicle caused substantial risk of serious physical harm to persons or property or was a proximate cause of serious physical harm to persons or property.

## B. Having a weapon while under disability

{¶ 11} Thompson ultimately entered a no-contest plea to a charge of having a weapon while under disability in Franklin County Common Pleas Court case No. 23CR-656, and we rely on the prosecutor's recitation of the facts from the plea hearing in that case. Police officers obtained a tip that Thompson might have been involved in a shooting that occurred August 2022. Detectives obtained a search warrant for Thompson's Instagram account and identified videos and images of Thompson holding handguns and a

rifle. The detectives also determined that Thompson previously had been adjudicated a delinquent juvenile for acts that would have constituted felony offenses if committed by an adult. The detectives then obtained a search warrant for Thompson's residence. Upon executing the search warrant, detectives discovered a loaded handgun in Thompson's bedroom closet. Thompson admitted the handgun belonged to him in a subsequent interview.

{¶ 12} A Franklin County Grand Jury indicted Thompson on one count of having a weapon while under disability, a third-degree felony in violation of R.C. 2923.13. The indictment asserted that on or about October 26, 2022, Thompson violated the statute by possessing a firearm while previously having been adjudicated a delinquent child for committing an offense that would have been a felony offense of violence if committed by an adult and for committing an offense that would have been a felony offense involving illegal possession of drugs if committed by an adult. Thompson entered a not-guilty plea and moved to suppress the handgun that was seized from his residence and statements he made to a police detective after his arrest. Thompson also moved to dismiss the indictment, arguing that R.C. 2923.13, as applied to him, violated his right to keep and bear arms under the Second and Fourteenth Amendments to United States Constitution.

{¶ 13} Following a hearing, the trial court denied Thompson's motion to suppress, concluding that no warrant was needed for the information Thompson posted on Instagram under the third-party doctrine and that there was probable cause to support the warrant for information from Thompson's Instagram account. The trial court also found that there was probable cause to support the search warrant for Thompson's residence.

{¶ 14} The trial court also denied Thompson's motion to dismiss the indictment, concluding that R.C. 2923.13 was not unconstitutional as applied to him. The trial court ruled that the plain text of the Second Amendment did not apply to Thompson's conduct because, as a person previously adjudicated delinquent for an act that would have been a felony offense if committed by an adult, Thompson was not among "the people" protected by the Second Amendment. (Dec. 20, 2023 Decision & Entry at 4-7.) The trial court also ruled that R.C. 2923.13, as applied to Thompson, was consistent with the nation's history and tradition of firearm regulation. Thompson changed his plea to a no-contest plea after the trial court denied his motion to suppress and motion to dismiss.

### C. Sentencing and appeal

{¶ 15} The trial court conducted a joint sentencing hearing for both cases. Pursuant to the jury verdict finding Thompson guilty in case No. 22CR-3408, the trial court imposed a sentence of 36 months of incarceration. Pursuant to the no-contest plea in case No. 23CR-656, the trial court imposed a sentence of 18 months of incarceration to be served consecutively to the sentence in case No. 22CR-3408. The trial court then suspended the sentences in both cases and placed Thompson on 60 months of community control supervision, with specified conditions, including completion of a residential community based correctional facility program. The trial court advised Thompson that if he violated community control, the suspended sentences would be imposed.

{¶ 16} Thompson timely appealed the trial court's judgment entries in case Nos. 22CR-3408 and 23CR-656.

## II. ASSIGNMENTS OF ERROR

{¶ 17} Thompson assigns the following as trial court errors:

> I. THE TRIAL COURT ERRED IN ENTERING A FINDING OF GUILTY IN CASE NO. 22CR-3408 BECAUSE THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> II. THE TRIAL COURT ERRED IN ENTERING A FINDING OF GUILTY IN CASE NO. 23CR-656 WHEN IT DID NOT LOOK TO THE NATION'S HISTORY AND TRADITION WHEN ENTERING A FINDING OF GUILT.

## III. LEGAL ANALYSIS

### A. First assignment of error – weight of the evidence supporting failure to comply conviction in case No. 22CR-3408

{¶ 18} Thompson's first assignment of error challenges the weight of the evidence supporting his conviction for failure to comply with an order of a police officer in case No. 22CR-3408. Thompson asserts the state's evidence merely establishes that he yelled at Gordon to "go" when he jumped back into the vehicle, but claims Gordon was ultimately responsible for driving away. Thompson further claims that the only evidence of aiding and abetting "was that he closed the door to the vehicle to help them get away faster." (Appellant's Brief at 7.) Thompson argues the vehicle could have fled at the same speed regardless of whether the door was open or closed.

### 1. Standard of review

{¶ 19} "[A] manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion." *State v. Harris*, 2023-Ohio-3994, ¶ 15 (10th Dist.). An appellate court presented with a manifest weight challenge sits as a "thirteenth juror" and may disagree with the jury's resolution of conflicting testimony. *State v. Cumberlander*, 2024-Ohio-2431, ¶ 39 (10th Dist.). In resolving a manifest weight challenge, however, "we 'may not merely substitute [our] view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Diallo*, 2025-Ohio-920, ¶ 21 (10th Dist.), quoting *State v. McCrary*, 2011-Ohio-3161, ¶ 12 (10th Dist.). Reversal of a jury verdict on manifest weight grounds requires unanimous concurrence of all three judges on the court of appeals panel reviewing the case. *Cumberlander* at ¶ 39.

### 2. Analysis of the weight of the evidence supporting conviction

{¶ 20} Thompson was charged with violating R.C. 2921.331(B), which prohibits "operat[ing] a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop." The term willfully "implies an act done intentionally, designedly, knowingly, or purposely, without justifiable excuse." *State v. Earlenbaugh*, 18 Ohio St.3d 19, 21 (1985). A violation of R.C. 2921.331(B) is a third-degree felony if the jury finds beyond a reasonable doubt that the operation of the motor vehicle was a proximate cause of serious physical harm to persons or property or caused a substantial risk of serious physical harm to persons or property. R.C. 2921.331(C)(5)(a)(i) and (ii).

{¶ 21} At trial, the state proceeded against Thompson under the principle of complicity, which is sometimes also referred to as accomplice liability. *See*, *e.g.*, *State v. Horton*, 2014-Ohio-2785, ¶ 8 (10th Dist.). A person is guilty of complicity to commit an offense and shall be punished as if he were the principal offender if he acts with the kind of culpability required for the principal offense while aiding or abetting another in committing the offense. R.C. 2923.03(A)(2) and (F). "To support a conviction for complicity by aiding

and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 2001-Ohio-1336, syllabus. "Such intent may be inferred from the circumstances surrounding the crime." *Id.* A charge of complicity may be stated in terms of R.C. 2923.03 or in terms of the principal offense. R.C. 2923.03(F). "Thus, a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is 'stated . . . in terms of the principal offense' and does not mention complicity." (Omission in original.) *State v. Herring*, 2002-Ohio-796, ¶ 35, quoting R.C. 2923.03(F).

{¶ 22} The evidence presented at trial established that Detective Willis gave a visible signal to stop by activating his cruiser lights and that Gordon initially complied by pulling to the side of the roadway and stopping the vehicle. After Detective Willis instructed Thompson to step out of the vehicle and Officer King asked Thompson if he had any weapons, Thompson then jumped back in the car and urged Gordon to drive away. Gordon drove away at high speed, traveling a short distance on a wet roadway before striking a utility pole, resulting in destruction of the utility pole and damage to the vehicle. Contrary to Thompson's claim on appeal that Gordon was responsible for the act of driving away and that he merely closed the car door when Gordon began to drive away, the evidence established that Thompson encouraged and incited Gordon to flee from the traffic stop by repeatedly yelling "go" as he jumped back in the car. *See Johnson* at syllabus.

{¶ 23} The Twelfth District Court of Appeals affirmed a conviction for complicity to failure to comply in a similar case. *State v. Suggs*, 2009-Ohio-95, ¶ 24-30 (12th Dist.). In that case, the defendant was a backseat passenger in a vehicle that fled after being stopped by the police. The driver testified that another passenger initially told him to drive away and that, during the ensuing chase, the defendant "told him to 'get out of here,' 'keep going,' 'go, go, go,' and 'whatever you do, don't stop.' " *Id.* at ¶ 27. On appeal, the Twelfth District conceded that the jury could have concluded the driver's testimony was not credible enough to prove the charge, but also that the jury "was free to draw the inference that [the defendant's] statements telling [the driver] to get out of here, keep going, go, go, go, and whatever you do, don't stop, demonstrated that he was an active participant in the flight

from officers and therefore guilty of complicity to failure to comply with the order or signal of a police officer." *Id.* at ¶ 29. Based on the evidence presented, the appellate court could not conclude that the jury clearly lost its way in convicting the defendant. *Id.* at ¶ 30.

{¶ 24} The Third District Court of Appeals also affirmed a conviction for complicity to failure to comply under similar circumstances. *State v. Allsup*, 2011-Ohio-405, ¶ 13-22 (3d Dist.). In that case, a police officer recognized the defendant at a convenience store and contacted his station to determine whether the defendant had outstanding warrants. *Id.* at ¶ 18. After receiving confirmation that the defendant was subject to an outstanding warrant, the officer approached a truck where the defendant was sitting in the passenger seat. As the officer began to tell the defendant to step out of the vehicle due to the pending warrant, the defendant denied his identity and said to the driver, " 'let's go dude' and rolled up his window." *Id.* The truck fled the convenience store parking lot, and the officer pursued in his cruiser. During the pursuit, the officer saw the defendant throw bottles of beer and cans at the cruiser from the passenger window, then retrieve other items from the bed of the truck and throw them onto the road in the path of the cruiser. *Id.* at ¶ 19. The officer testified he had to take evasive action to avoid the objects that the defendant threw. *Id.* On appeal, the Third District concluded that the conviction for complicity to failure to comply was not against the manifest weight of the evidence. *Id.* at ¶ 22.

{¶ 25} Similar to *Suggs* and *Allsup*, based on the evidence presented at trial establishing that Thompson verbally encouraged and incited Gordon to flee, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice by convicting Thompson of complicity to failure to comply with an order of a police officer. Accordingly, we overrule Thompson's first assignment of error.

**B. Second assignment of error – constitutional challenge to having a weapon under disability charge in case No. 23CR-656**

{¶ 26} In his second assignment of error, Thompson asserts the trial court erred by denying his motion to dismiss the indictment in case No. 23CR-656. Thompson claims the trial court failed to consider whether R.C. 2923.13 violates his rights under the Second Amendment to the United States Constitution, as applied against the states through the Fourteenth Amendment to the United States Constitution, because it is not consistent with the nation's history and tradition of firearm regulation.

### 1. Standard of review

{¶ 27} Thompson's motion to dismiss asserted that R.C. 2923.13 is unconstitutional as applied to him. The constitutionality of a statute is a question of law that we review de novo. *Cleveland v. State*, 2019-Ohio-3820, ¶ 15. Statutes are presumed to be constitutional and a party challenging a statute bears a heavy burden to overcome that presumption of constitutionality by proving beyond a reasonable doubt that the statute is unconstitutional. *State v. Clark*, 2024-Ohio-1869, ¶ 18 (10th Dist.). "A statute may be challenged as unconstitutional on the basis that it is invalid on its face or as applied to a particular set of facts." *State v. Lowe*, 2007-Ohio-606, ¶ 17. In an as-applied challenge, a party "need show only that the legislation is unconstitutional as applied to a specific set of facts" whereas in a facial challenge the challenger must establish that the law is unconstitutional in all instances. *State v. Hacker*, 2023-Ohio-2535, ¶ 11.

### 2. Thompson's constitutional claim

{¶ 28} Thompson was indicted for violating R.C. 2923.13, which provides, in relevant part, as follows:

> (A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
>
> . . .
>
> (2) The person . . . has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.
>
> (3) The person . . . has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

The indictment in case No. 23CR-656 alleged that Thompson violated R.C. 2923.13 by possessing a handgun because he previously had been adjudicated a delinquent juvenile for committing offenses that would have been felony offenses of violence if committed by an adult, i.e., a violation of R.C. 2923.13(A)(2), and for committing an offense that would have been a felony offense involving the illegal possession of drugs if committed by an adult, i.e.,

a violation of R.C. 2923.13(A)(3). The indictment alleged that Thompson had been adjudicated a delinquent juvenile in separate cases for the offenses of robbery, aggravated robbery, and aggravated possession of drugs.

{¶ 29} The trial court concluded that R.C. 2923.13 was not unconstitutional as applied to Thompson because he was not among "the people" protected by the Second Amendment due to his prior juvenile delinquency adjudications for acts that would have been felony offenses if committed by an adult. The trial court also concluded that R.C. 2923.13, as applied to Thompson, was consistent with the nation's history and tradition of firearm regulation.

### 3. Analytical framework for Second Amendment claims

### a. The Second Amendment to the United States Constitution

{¶ 30} "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II.

{¶ 31} For more than two centuries following the ratification of the Bill of Rights, courts generally concluded that the Second Amendment did not confer an individual right to bear arms.[2] *See Arnold v. Cleveland*, 67 Ohio St.3d 35, 39 (1993) ("The question as to whether individuals have a fundamental right to bear arms has, seemingly, been decided in the negative under the Second Amendment to the United States Constitution."); *see also United States v. Miller*, 307 U.S. 174, 178 (1939) (stating the Second Amendment must be interpreted and applied in light of the congressional power to call forth and organize the militia); *Hickman v. Block*, 81 F.3d 98, 100-01 (9th Cir. 1996) ("We follow our sister circuits in holding that the Second Amendment is a right held by the states, and does not protect the possession of a weapon by a private citizen."); *United States v. Johnson*, 497 F.2d 548, 550 (4th Cir. 1974), quoting *Miller* at 178 ("The courts have consistently held that the Second Amendment only confers a collective right of keeping and bearing arms which must bear a 'reasonable relationship to the preservation or efficiency of a well regulated militia.' "); *Stevens v. United States*, 440 F.2d 144, 149 (6th Cir. 1971) ("Since the Second

---

[2] Notwithstanding the general consensus among courts, the question of whether the Second Amendment conferred an individual right to bear arms remained a topic of academic debate and scholarly commentary, particularly in the latter decades of the 20th century. *See Printz v. United States*, 521 U.S. 898, 938, fn. 2 (1997) (Thomas, J., concurring) (collecting citations of books and scholarly articles on the question of whether the Second Amendment confers a personal right to bear arms).

Amendment right 'to keep and bear Arms' applies only to the right of the State to maintain a militia and not to the individual's right to bear arms, there can be no serious claim to any express constitutional right of an individual to possess a firearm."). Courts also generally concluded that the Second Amendment did not apply against state governments. *See Arnold* at 41 ("We note that the Second Amendment has not yet been held to be applicable to the states. The amendment has not been absorbed either directly or through selective incorporation in the Fourteenth Amendment."); *see also Presser v. Illinois*, 116 U.S. 252, 265 (1886) (asserting that "the [Second] amendment is a limitation only upon the power of Congress and the National government, and not upon that of the States"); *United States v. Cruikshank*, 92 U.S. 542, 553 (1876) ("The second amendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress."); *Peoples Rights Org., Inc. v. Columbus*, 152 F.3d 522, 538, fn. 18 (6th Cir. 1998) ("The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment does not incorporate the Second Amendment; hence, the restrictions of the Second Amendment operate only upon the Federal Government."); *Love v. Pepersack*, 47 F.3d 120, 123 (4th Cir. 1995) ("The Second Amendment does not apply to the states.").

{¶ 32} The landscape of Second Amendment jurisprudence changed in 2008, when the United States Supreme Court declared that "the Second Amendment confer[s] an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). Two years later, the Court held that "the Second Amendment right is fully applicable to the States." *McDonald v. Chicago*, 561 U.S. 742, 750 (2010). Both *Heller* and *McDonald* involved laws affecting the right to possess a handgun in the home for self-defense. *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 10 (2022). Notably, in both decisions, the Court asserted that its opinions should not be read to imperil certain longstanding limitations on firearm possession. *See Heller* at 626-27 ("Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."); *McDonald* at 786 ("We repeat [the] assurances [made in *Heller*] here. Despite municipal respondents'

doomsday proclamations, incorporation does not imperil every law regulating firearms."). A footnote in *Heller* referred to such limitations on firearm possession as "presumptively lawful." *Heller* at 627, fn. 26.

### b. Development of the *Bruen/Rahimi* framework for Second Amendment challenges

{¶ 33} The Sixth Circuit Court of Appeals recently described the development of Second Amendment jurisprudence following *Heller* and *McDonald*:

> In the years after *Heller*, courts mapped the contours of the right [to bear arms] through a combination of historical analysis and means-ends scrutiny. *See, e.g., United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012). They first asked whether the challenged regulation burdens conduct that historically fell within the scope of the right. *See id.* If so, then the court balanced the government's asserted interest against the burden imposed by its regulation. *See id.* If the ends justified the means, then the challenger lost.

*United States v. Williams*, 113 F.4th 637, 643 (6th Cir. 2024). *See Bruen* at 17 ("In the years since [*Heller* and *McDonald*], the Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny.").

{¶ 34} In 2022, the United States Supreme Court expanded on its prior rulings in *Heller* and *McDonald* by holding that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Bruen* at 10. The *Bruen* decision rejected use of a "means-end" test and clarified the analytical framework to be applied to Second Amendment challenges:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10, 81 S. Ct. 997, 6 L. Ed. 2d 105 (1961).

*Bruen* at 17.  This standard "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."  *Id*. at 26.  The Court acknowledged that applying this standard would require courts to engage in analogical reasoning to determine whether a modern firearm regulation was relevantly similar to historical regulations.  *Id*. at 28-29.  Two important considerations the Court identified were "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id*. at 29.

{¶ 35} The United States Supreme Court subsequently applied the principles set forth in *Bruen* to an appeal challenging 18 U.S.C. 922(g)(8), a federal statute that prohibits an individual subject to a domestic violence restraining order from possessing a firearm if the restraining order included a finding that the individual represented a credible threat to the physical safety of an intimate partner.  *United States v. Rahimi*, 602 U.S. 680, 684 (2024).  The Court noted that the burden imposed on the right to bear arms was temporary because the statute only prohibited firearm possession so long as the defendant was subject to a restraining order.  *Id*. at 699.  The Court found the statute to be constitutional, concluding that "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms."  *Id*. at 690.  Expounding on *Bruen*, the Court asserted that "the appropriate [Second Amendment] analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."  *Id*. at 692, citing *Bruen* at 597 U.S. at 26-31.  "A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.' "  *Id*., quoting *Bruen* at 29 and fn. 7.  In conducting its historical analysis, the Supreme Court noted that "[f]rom the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others."  *Id*. at 693.  Referring to *Heller*'s recognition of longstanding prohibitions on firearm possession by certain persons, the Court asserted "we do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse."  *Id*. at 698.  *See id*. at 699, quoting *Heller*, 554 U.S. at 626, 627, fn. 26 ("But *Heller* never established a categorical rule that the Constitution prohibits regulations

that forbid firearm possession in the home.  In fact, our opinion stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.' ").  Ultimately, the Court concluded that "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Id.* at 700.

{¶ 36}  The *Bruen* and *Rahimi* decisions set forth a two-step framework for analysis of a Second Amendment challenge to a firearm regulation: (1) whether the plain text of the Second Amendment covers the act or course of conduct and (2) if it does, whether the government can demonstrate that the regulation is consistent with the principles that underpin the nation's historical tradition of firearm regulation.  *See, e.g.*, *United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024); *Williams*, 113 F.4th at 648.

### 4. Application of the *Bruen*/*Rahimi* framework in challenges to federal law prohibiting firearm possession by persons convicted of felony offenses

{¶ 37}  Numerous federal courts have applied the *Bruen*/*Rahimi* framework to Second Amendment challenges to 18 U.S.C. 922(g)(1), a statute that prohibits firearm possession by a person who has been convicted in any court of a crime punishable by imprisonment for more than one year.  *See, e.g.*, *United States v. Hunt*, 123 F.4th 697, 704-08 (4th Cir. 2024); *United States v. Diaz*, 116 F.4th 458, 467-71 (5th Cir. 2024); *Williams* at 648-62; *United States v. Jackson*, 110 F.4th 1120, 1125-29 (8th Cir. 2024).

{¶ 38}  We find the Sixth Circuit's discussion of the *Bruen*/*Rahimi* framework in the *Williams* case to be instructive.  Williams, who had a prior felony conviction for aggravated robbery, was charged with violating 18 U.S.C. 922(g)(1) following the discovery of a loaded pistol in his car trunk during a traffic stop.  *Williams* at 642.  After the trial court denied his motion to dismiss the indictment on constitutional grounds, Williams pleaded guilty and appealed to the Sixth Circuit.  *Id.*

{¶ 39}  On appeal, the Sixth Circuit applied the *Bruen*/*Rahimi* framework to evaluate the constitutionality of 18 U.S.C. 922(g)(1).  With respect to the first step of the *Bruen*/*Rahimi* framework, the court concluded that "[n]othing in the Second Amendment's text draws a distinction among the political community between felons and non-felons—or, for that matter, any distinction at all."  *Id.* at 649.  Therefore, the court

concluded, the text of the Second Amendment presumptively covered Williams's conduct. *Id.*

{¶ 40} The court then turned to the second step of the *Bruen/Rahimi* framework—i.e., whether the burden imposed by the statute was "consistent with the principles underpinning our historical tradition of regulating firearms." *Id.* at 650. Surveying the historical record, the Sixth Circuit concluded that English history demonstrated that "early English kings and Parliament alike disarmed individuals they deemed dangerous." *Id.* The court cited the Militia Act of 1662, which allowed the king of England to seize arms from subjects deemed to be dangerous to the peace of the kingdom, along with later provisions allowing for disarmament of Catholics unless they declared loyalty to the monarch. *Id.* at 650-52. The court concluded that the practice of disarming dangerous individuals continued in the colonial era, citing acts from the Massachusetts Bay colony limiting arms for "seditious libelers" and the Virginia colony prohibiting distribution of arms to Native Americans. *Id.* at 652. The court cited Revolutionary-era laws providing for disarmament of those loyal to England. *Id.* at 653-54. The court also referred to ratification-era proposals allowing disarmament of dangerous individuals. *Id.* at 654-56. Based on its historical review, the Sixth Circuit concluded that disarmament of dangerous persons was part of the nation's history and tradition:

> [G]overnments in England and colonial America long disarmed groups that they deemed to be dangerous. Such populations, the logic went, posed a fundamental threat to peace and thus had to be kept away from arms. For that reason, governments labeled whole classes as presumptively dangerous. This evaluation was not always elegant. And even though some of those classifications would offend both modern mores and our current Constitution, there is no doubt that governments have made such determinations for centuries.

*Id.* at 657.

{¶ 41} The Sixth Circuit rejected Williams's facial challenge to 18 U.S.C. 922(g)(1), concluding that most applications of the statute were constitutional and consistent with the history and tradition of disarming individuals believed to be dangerous. *Id.* With respect to Williams's as-applied challenge, the court noted that 18 U.S.C. 922(g)(1) did not "provide a mechanism allowing individuals to prove the class-wide presumption shouldn't apply to them." *Id.* However, drawing a parallel to historical statutes that "authorized the official

doing the disarming, usually the local justice of the peace, to make the dangerousness determination," the court concluded that trial court judges effectively make a dangerousness determination when they consider as-applied challenges to the statute. *Id.* The Sixth Circuit held that in determining whether an individual has demonstrated he is not dangerous "and thus falls outside of [18 U.S.C.] § 922(g)(1)'s constitutionally permissible scope," courts must focus on the individual's specific characteristics, including the individual's entire criminal record, not just the particular predicate offense giving rise to the charge. *Id.*

{¶ 42} The Sixth Circuit reasoned that when considering dangerousness there were three broad classes of criminal offenses: (1) crimes against the person, such as murder, rape, assault, and robbery, (2) crimes that "while not strictly crimes against the person, may nonetheless pose a significant threat of danger," such as drug trafficking, and (3) crimes that cause no physical harm to another person or the community, such as making false statements or mail fraud. *Id.* at 658-59. The Sixth Circuit rejected the idea of bright-line categorical determinations of an individual's dangerousness based on these classifications. *Id.* at 660. However, the court also asserted "there is little debate that violent crimes are at least strong evidence that an individual is dangerous, if not totally dispositive on the question." *Id.* at 658. In Williams's individual case, the court noted he had two felony convictions for aggravated robbery that involved robbery of two people at gunpoint and concluded those offenses alone were sufficient to conclude that, if armed, Williams posed a danger to others or the public. *Id.* at 662. The court further noted Williams had also been convicted of attempted murder, which also demonstrated his dangerousness.

{¶ 43} After rejecting Williams's individual as-applied challenge, the Sixth Circuit summarized its holding:

> Our nation's historical tradition confirms *Heller*'s assumption that felon-in-possession laws are "presumptively lawful." The history reveals that legislatures may disarm groups of people, like felons, whom the legislature believes to be dangerous—so long as each member of that disarmed group has an opportunity to make an individualized showing that he himself is not actually dangerous.

*Id.* at 663.

### 5. Application of the *Bruen/Rahimi* framework by Ohio courts in challenges to R.C. 2923.13

{¶ 44} The Supreme Court of Ohio has not yet issued a decision applying the *Bruen/Rahimi* framework to a Second Amendment challenge[3] and has not considered the constitutionality of R.C. 2923.13 under that framework.[4] However, several other Ohio appellate courts have addressed the constitutionality of R.C. 2923.13 in the post-*Bruen* era. *See State v. Hodges*, 2025-Ohio-5448 (6th Dist.); *State v. Thacker*, 2024-Ohio-5835 (1st Dist.); *State v. Skaggs*, 2024-Ohio-4781 (5th Dist.); *State v. King*, 2024-Ohio-4585 (8th Dist.); *State v. Windland*, 2024-Ohio-1760 (5th Dist.).

### a. The Eighth District rejects a facial challenge to R.C. 2923.13(A)(2) – *State v. King*

{¶ 45} A few months after *Rahimi* was decided, the Eighth District Court of Appeals considered a facial challenge to the constitutionality of R.C. 2923.13(A)(2). *King* at ¶ 18. King previously had been adjudicated a delinquent juvenile for an act that would have constituted felony domestic violence if committed by an adult. *Id.* at ¶ 3. Police officers found a rifle in King's home while executing a search warrant related to an animal protection complaint; he was then charged with violating R.C. 2923.13(A)(2). *Id.* at ¶ 2. King moved to dismiss the indictment, challenging the constitutionality of the statute. The trial court denied the motion to dismiss and King entered a no-contest plea. *Id.* at ¶ 9.

{¶ 46} On appeal, King argued that R.C. 2923.13(A)(2) was facially unconstitutional.[5] *Id.* at ¶ 12. After briefly reviewing *Heller, McDonald, Bruen*, and *Rahimi*, the Eighth District Court of Appeals concluded that R.C. 2923.13(A)(2) did not violate the Second Amendment on its face:

---

[3] During the period after *Heller* and *McDonald* but before *Bruen* and *Rahimi*, the Supreme Court of Ohio rejected a Second Amendment challenge to R.C. 2923.15. *State v. Weber*, 2020-Ohio-6832, ¶ 47. The majority in *Weber* applied an "intermediate-scrutiny test" to assess whether the statute was constitutional. *Id.* In a concurring decision, however, Justice DeWine addressed the core principles that would later form the *Bruen/Rahimi* framework. *Id.* at ¶ 57-109 (DeWine, J., concurring). Notably, Justice DeWine acknowledged the "considerable historical evidence" supporting "restrictions on firearm use by those who presented a danger to others." *Id.* at ¶ 89 (DeWine, J., concurring).

[4] We note that the Supreme Court of Ohio accepted jurisdiction over a Second Amendment challenge to a different statute, R.C. 2923.121, in *State v. Striblin*, Sup. Ct. No. 2024-1050 and heard oral argument in that case on October 8, 2025. As of the release date of this decision, the Supreme Court had not yet issued a decision in the *Striblin* case.

[5] The *King* decision noted that King had abandoned his as-applied challenges to the statute on appeal. *King* at ¶ 13, fn. 1.

> In *Rahimi*, the U.S. Supreme Court unequivocally specified that it is not a violation of the Second Amendment to disarm an "*individual*" (which is not limited to an adult), who has been "found by a *court*" (which is not limited to an adult court), to "pose a credible threat to the physical safety of another" (without specifying that this may be determined only by a conviction versus a juvenile adjudication). . . . We therefore find that the challenged statute, as it pertains to both adult violent felony convictions and juvenile adjudications that would be the equivalent of an adult violent felony conviction, fall within *Rahimi*'s guidance.

(Emphasis added in *King*.)  *Id*. at ¶ 28, quoting *Rahimi*, 602 U.S. at 702.

{¶ 47} King argued that juvenile delinquency adjudications should be viewed differently from adult convictions because the juvenile system has different goals and because juvenile cases are not tried before juries. *Id*. at ¶ 30.  The Eighth District rejected those arguments, concluding they related "to the culpability and rehabilitative nature of juvenile offenses" but did not relate to the nation's history and tradition of firearms regulation. *Id*. at ¶ 32.  The court reiterated its conclusion that, in light of *Rahimi*, "it is not violative of the Second Amendment to temporarily disarm those who pose a threat to the physical safety of others, regardless of the predicating 'event' or age of the offender at the time of the predicating event." *Id*.  The court held that disarmament under R.C. 2923.13(A)(2) could be considered temporary because an individual can apply for relief from a weapons disability pursuant to R.C. 2923.14. *Id*.  Based on these conclusions, the Eighth District held that the trial court did not err in denying King's motion to dismiss because R.C. 2923.13(A)(2) does not violate the Second Amendment.[6] *Id*. at ¶ 41.

### b. The First District sustains an as-applied challenge to R.C. 2923.13(A)(3) – *State v. Thacker*

{¶ 48} The First District Court of Appeals applied the *Bruen/Rahimi* framework in *Thacker*, which involved a prosecution for having a weapon while under a disability in violation of R.C. 2923.13(A)(3).  The predicate offense, which occurred more than 13 years earlier, was a juvenile delinquency adjudication for an act that would have constituted fifth-degree felony drug trafficking if committed by an adult. *Thacker*, 2024-Ohio-5835, at ¶ 3 (1st Dist.).  The trial court granted Thacker's motion to dismiss the charges, based on an as-

---

[6] The Supreme Court of Ohio has accepted an appeal from the Eighth District's decision in *King* and held the cause for its decision in *Striblin*. *02/26/2025 Case Announcements* at 10, 2025-Ohio-598.

applied argument that the statute violated the Second and Fourteenth Amendments to the United States Constitution, and the state appealed to the First District Court of Appeals. *Id.* at ¶ 5.

{¶ 49} The First District surveyed federal court decisions on constitutional challenges to 18 U.S.C. 922(g)(1) and Ohio appellate court decisions on constitutional challenges to R.C. 2923.13(A). *Id.* at ¶ 28-41. Based on its review of the case law and the historical evidence discussed in those decisions, the First District posited seven conclusions relevant to determining the constitutionality of a categorical ban on firearm ownership. *Id.* at ¶ 43-53. Among those conclusions were that the nation "has a 'history and tradition' of disarming individuals who pose a particular danger with a firearm," which "could include persons who pose an immediate threat to the physical safety of others, or those whose possession of a firearm would be likely to terrify the public." *Id.* at ¶ 44. The court also concluded that legislatures "may make categorical judgments about who is too dangerous to possess a firearm." *Id.* at ¶ 45. With respect to the duration of disarmament, the First District concluded that "to be analogous to founding-era laws, a dangerousness-based firearms prohibition may last roughly as long as the danger it seeks to prevent." *Id.* at ¶ 51. But the court appeared to acknowledge that indefinite disarmament might be permissible under certain circumstances, concluding that "where the basis for deeming an individual dangerous is presumed to continue indefinitely, so may the disarmament—so long as the disarmed individual is given the opportunity to lift their disability in the event of changed circumstances or inaccurate classification." *Id.* at ¶ 53. Ultimately, the court concluded "the constitutionality of a categorical, class-wide disarmament that is predicated upon the 'dangerousness' of the class will generally depend upon (1) whether the class of persons disarmed can reasonably be presumed dangerous with a firearm, and (2) whether the duration of the disarmament is realistically tailored to the danger persons in that class pose." *Id.* at ¶ 54.

{¶ 50} Applying these principles to the facts of the case, the First District concluded that R.C. 2923.13(A)(3) was unconstitutional as applied to Thacker, who had been adjudicated delinquent for conduct that, if committed by an adult, would have constituted felony complicity to trafficking in marijuana. *Id.* at ¶ 105. The court rejected the state's argument that any person who had committed a felony offense could be disarmed, even if

that offense was committed when the person was a juvenile. The court concluded that a juvenile delinquency adjudication differed from an adult felony conviction, citing the different purposes and the different procedural standards of the juvenile justice system, along with precedent holding that a juvenile adjudication cannot be used as a surrogate for an adult conviction. *Id.* at ¶ 68-71, 75-76. The court also rejected the state's argument that Thacker could be disarmed based on dangerousness, concluding it was not clear that marijuana trafficking involved the kind of danger that justified limitation of Second Amendment rights and that an adjudication of delinquency for complicity to drug trafficking did not necessarily justify a presumption of dangerousness as an adult. *Id.* at ¶ 84-85. The court further reasoned that even if Thacker could be presumed dangerous, he could not be disarmed indefinitely. *Id.* at ¶ 89-96.

{¶ 51} The court rejected the state's argument that R.C. 2923.13 did not impose indefinite disarmament because an individual could petition for removal of the disability under R.C. 2923.14. The court asserted that such a system must provide objective standards for when a firearm disability would be removed, rather than relying on a subjective determination that an individual is no longer likely to violate the law. *Id.* at ¶ 97-104. Ultimately, the First District concluded that R.C. 2923.13(A)(3) was unconstitutional as applied to Thacker because he "was (1) adjudicated delinquent as a minor (2) for nonviolent conduct, thus (3) disarming him, presumptively for life, (4) subject only to a trial court's discretionary determination whether to lift his disability."[7] *Id.* at ¶ 105.

{¶ 52} Judge Winkler dissented from the decision in *Thacker*, asserting that R.C. 2923.14 allows a person to make an individualized showing of his qualifications to bear arms, thereby providing an avenue for relief from disarmament under R.C. 2923.13. *Id.* at ¶ 112-14. Judge Winkler noted Thacker had an opportunity to prove he was not dangerous by seeking relief under R.C. 2923.14 but failed to do so and concluded that Thacker could not subsequently assert that R.C. 2923.13(A)(3) was unconstitutional as applied to him. *Id.* at ¶ 115. Judge Winkler also concluded that historical tradition of disarming those deemed to be dangerous does not change when the dangerousness is established by a

---

[7] The Supreme Court of Ohio has accepted an appeal from the First District's decision in *Thacker* and held the cause for its decision in *Striblin*. *03/04/2025 Case Announcements* at 3, 2025-Ohio-705.

juvenile adjudication for an act that would constitute a felony offense if committed by an adult. *Id*. at ¶ 132.

**c. The Fifth District and Sixth District reject challenges to R.C. 2923.13(A)(2) and (A)(3) – *Windland*, *Skaggs*, and *Hodges***

{¶ 53} The Fifth District Court of Appeals and Sixth District Court of Appeals have also recently considered constitutional challenges to R.C. 2923.13 in cases where the predicate offenses were adult felony convictions. Although these decisions lack the "juvenile adjudication" element present in *King*, *Thacker*, and this case, we find the courts' reasoning instructive as to the general trend in Second Amendment analysis.

{¶ 54} In a decision issued after *Bruen* but before *Rahimi*, the Fifth District Court of Appeals rejected facial and as-applied challenges to R.C. 2923.13(A)(2). *Windland*, 2024-Ohio-1760, at ¶ 21-23 (5th Dist.). Windland previously had been convicted of aggravated robbery and felonious assault and was charged with violating R.C. 2923.13(A)(2) after a search of his residence resulted in discovery of a loaded handgun, drugs, and drug paraphernalia. *Id*. at ¶ 5-6. Windland moved to dismiss the weapon under disability charge as violating his Second Amendment rights; the trial court denied his motion and he entered a no-contest plea. *Id*. at ¶ 8-9. Citing federal court decisions, the Fifth District concluded that there was a "historical tradition of keeping guns from individuals viewed as dangerous, including felons," and concluded that R.C. 2923.13(A)(2) was constitutional as consistent with that historical tradition.[8] *Id*. at ¶ 21.

{¶ 55} Later the same year, after the *Rahimi* decision had been issued, the Fifth District Court of Appeals rejected an as-applied challenge to R.C. 2923.13(A)(3). *Skaggs*, 2024-Ohio-4781, at ¶ 31 (5th Dist.). Skaggs previously had been convicted of felony possession of heroin and was charged with violating R.C. 2923.13(A)(3) after a loaded firearm was found in his vehicle during a traffic stop. *Id*. at ¶ 2-3. Skaggs moved to dismiss the charge as violating his Second Amendment rights; the trial court denied the motion and he entered a no-contest plea. *Id*. at ¶ 4-7. Specifically citing the Sixth Circuit's decision in *Williams* and Justice DeWine's separate concurrence in *State v. Weber*, 2020-Ohio-6832, the Fifth District concluded that there is a historical tradition of disarming those the government deems to be dangerous. *Skaggs* at ¶ 17-18. The court concluded that Skaggs's

---

[8] The Supreme Court of Ohio declined to exercise jurisdiction over an appeal from the Fifth District's decision in *Windland*. *08/06/2024 Case Announcements* at 5, 2024-Ohio-2927.

prior "drug offense indicates he is more likely than the average person to commit a future felony, marking him as the sort of threat to public safety that the Ohio legislature can permissibly seek to eliminate by stripping him of his Second Amendment rights." *Id.* at ¶ 22. The court also noted federal court decisions upholding federal prohibitions on weapon possession by persons convicted of felonies or persons using controlled substances. *Id.* at ¶ 21-22.

{¶ 56} In a recent decision, the Sixth District Court of Appeals relied heavily on *Skaggs* in reviewing a Second Amendment challenge to R.C. 2923.13(A)(3) brought by an individual who had a prior felony conviction for cocaine trafficking. *Hodges*, 2025-Ohio-5448, at ¶ 2, 14-18 (6th Dist.).9 The court concluded that R.C. 2923.13(A)(3) was constitutional on its face and generally as applied to individuals convicted of nonviolent drug trafficking offenses because it was consistent with the historical tradition of firearm regulation. *Id.* at ¶ 18. With respect to Hodges's individual as-applied challenge, the court concluded there was insufficient evidence to determine whether Hodges demonstrated that he was no longer dangerous because the parties had not provided any sworn testimony or submitted any stipulation of facts. *Id.* at ¶ 21. Therefore, the Sixth District remanded the case to the trial court for factual findings on the record. *Id.*

6. **Applying step one of the *Bruen/Rahimi* framework – whether Thompson's conduct was covered by the plain text of the Second Amendment**

{¶ 57} Having surveyed the application of the *Bruen/Rahimi* framework by federal courts and by our fellow Ohio appellate courts, we turn to the application of that test in the present case.

{¶ 58} Under the first step of the *Bruen/Rahimi* framework, we consider whether the plain text of the Second Amendment covers Thompson's conduct. In this case, that conduct was possession of a firearm in his home. The trial court concluded that Thompson's conduct was not covered by the plain text of the Second Amendment because he was not a law-abiding individual due to his previous juvenile delinquency adjudications and therefore was not among "the people" protected by the Second Amendment. On appeal, the state admits that most courts have construed the meaning of "the people"

---

9 The Supreme Court of Ohio has accepted an appeal from the Sixth District's decision in *Hodges* and held the cause for its decision in *Striblin*. *03/31/2026 Case Announcements* at 2, 2026-Ohio-1092.

protected by the Second Amendment more broadly than the trial court did in this case.  The state argues, however, that we should not overrule the trial court's conclusion on this issue because Thompson failed to sufficiently challenge the trial court's conclusion and failed to demonstrate that his conduct was protected by the plain text of the Second Amendment.

{¶ 59} Courts applying the *Bruen/Rahimi* framework generally have rejected the conclusion that the trial court reached in this case—i.e., that a person who has previously committed a felony offense is not among "the people" protected by the Second Amendment.  *See*, *e.g.*, *United States v. Duarte*, 137 F.4th 743, 755 (9th Cir. 2025) ("[I]n the face of these conflicting interpretations of history, we adhere to the Supreme Court's definition of 'the people,' which does not exclude felons."); *Diaz*, 116 F.4th at 466 ("The government also raises the familiar argument that Diaz is not among 'the people' protected by the Second Amendment.  We disagree."); *Williams*, 113 F.4th at 649 ("Nothing in the Second Amendment's text draws a distinction among the political community between felons and non-felons—or, for that matter, any distinction at all.  Williams, an American citizen, is a member of this political community.").  *But see Hunt*, 123 F.4th at 705 (concluding that possession of firearms by persons convicted of felony offenses is an activity that falls outside the scope of the Second Amendment as originally understood).  We note, as many of these courts have, that the *Heller* decision posited "a strong presumption that the Second Amendment right is exercised individually and belongs to *all* Americans."  (Emphasis added.)  *Heller*, 554 U.S. at 581.  Consistent with this broad construction of the scope of the Second Amendment, for purposes of this appeal we assume, without deciding, that Thompson's conduct in this case—i.e., possessing a firearm in his home—is covered by the plain text of the Second Amendment, notwithstanding his prior juvenile delinquency adjudications.[10]  *See Thacker*, 2024-Ohio-5835, at ¶ 59 (1st Dist.)  (Emphasis in original.) ("[W]e hold that the statute burdens conduct protected by the Second Amendment.  This statute, R.C. 2923.13, prohibits an individual subject to one of the listed disabilities from

---

[10] Notwithstanding our assumption for purposes of this case that Thompson's conduct was within the scope of the Second Amendment, we note Justice DeWine's pre-*Bruen* concurrence in *Weber* which asserted "[t]here is considerable historical evidence that restrictions on firearm use by those who presented a present danger to others *fell outside* the Second Amendment right."  (Emphasis added.)  *Weber*, 2020-Ohio-6832, at ¶ 89 (DeWine, J., concurring).

owning *any* firearm at all.").

### 7. Applying step two of the *Bruen/Rahimi* framework – whether R.C. 2923.13, as applied to Thompson, is consistent with the nation's history and tradition of firearms regulation

{¶ 60} The second step of the *Bruen/Rahimi* framework requires this court to consider whether the prohibition on firearm possession under R.C. 2923.13, as applied to Thompson in this case, is consistent with the principles that underpin the nation's historic tradition of firearm regulation.

{¶ 61} Thompson's indictment was predicated on prior juvenile delinquency adjudications for conduct in three separate incidents that would have constituted felony offenses of robbery, aggravated robbery, and aggravated possession of drugs, if committed by an adult. Therefore, the indictment charged Thompson with violating both R.C. 2923.13(A)(2) and (A)(3). Accordingly, if either of those provisions is constitutional as applied to Thompson, the trial court did not err by denying his motion to dismiss.

### a. Prohibition on firearm possession based on juvenile adjudications for acts that would have constituted offenses of violence

{¶ 62} R.C. 2923.13(A)(2) prohibits firearm possession by a person who "is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence." As explained above, numerous courts have concluded that disarmament of dangerous individuals is consistent with the nation's history and tradition of firearm regulation. *See*, *e.g.*, *Williams*, 113 F.4th at 657; *Thacker*, 2024-Ohio-5835, at ¶ 44 (1st Dist.). We also note Justice DeWine's pre-*Bruen* concurrence that concluded "the best available evidence about the founding generation's understanding of the right to bear arms reveals that the right did not preclude restrictions on classes of people who presented a present danger to others." *Weber*, 2020-Ohio-6832, at ¶ 77 (DeWine, J., concurring).

{¶ 63} In this case, the evidence introduced at the suppression hearing established that in May 2017, Thompson was adjudicated a delinquent juvenile for committing an offense that would have constituted robbery in violation of R.C. 2911.02(A)(2) if committed by an adult. The evidence also established that in November 2018, Thompson was adjudicated a delinquent juvenile for committing an offense that would have constituted

aggravated robbery in violation of R.C. 2911.01(A)(1) if committed by an adult, and that Thompson displayed or brandished a firearm while committing that offense.  Under Ohio law, both robbery and aggravated robbery are defined as offenses of violence.  *See* R.C. 2901.01(A)(9)(a); *State v. V.M.D.*, 2016-Ohio-8090, ¶ 6 ("R.C. 2901.01(A)(9)(a) defines a violation of R.C. 2911.02, robbery, as an offense of violence[.]"); *State v. Freeman*, 2020-Ohio-3381, ¶ 28 (10th Dist.) ("Aggravated robbery is a first-degree felony offense of violence.").  We agree with the Sixth Circuit's conclusion that commission of a crime of violence against a person is "at least strong evidence that an individual is dangerous." *Williams* at 658.  In this case, Thompson's commission of an act of aggravated robbery with a firearm is sufficient to conclude that, if armed, Thompson presents a danger to others. *See id.* at 662.  Thompson's earlier commission of an act of robbery further supports that conclusion.

{¶ 64} We acknowledge that the limitation on Thompson's right to possess a firearm arose from a juvenile delinquency adjudication, rather than a felony conviction, but we conclude that distinction is immaterial for purposes of determining whether Thompson presents a danger to others.  The *Bruen/Rahimi* framework requires us to consider the nation's history and tradition of firearm regulation; at the time the Bill of Rights was adopted, there was no separate juvenile justice system.  *See In re Gault*, 387 U.S. 1, 16 (1967) ("At common law, children under seven were considered incapable of possessing criminal intent. Beyond that age, they were subjected to arrest, trial, and in theory to punishment like adult offenders.").  We agree with the Eighth District's conclusion that under the *Bruen/Rahimi* framework, the nation's history and tradition of firearm regulation establishes that disarming individuals who pose a threat to the physical safety of others does not violate the Second Amendment, even if the event establishing the individual's dangerousness occurred when he was younger than 18 years old.  *See King*, 2024-Ohio-4585, at ¶ 32 (8th Dist.) ("Even viewing [the argument that juvenile adjudications should be viewed as separate and distinct from an adult conviction such that it should not constitute a disabling offense for purposes of R.C. 2923.13] in light of *Bruen*'s instruction, we note that these arguments go to the culpability and rehabilitative nature of juvenile offenses; they do not specifically relate to 'the history and tradition of firearms regulation' and can coexist with the holding in *Rahimi* – that it is not violative of the Second

Amendment to temporarily disarm those who pose a threat to the physical safety of others, regardless of the predicating 'event' or age of the offender at the time of the predicating event."). Further, the Supreme Court of Ohio rejected a pre-*Bruen* Due Process Clause challenge to R.C. 2923.13(A)(2), concluding that "[a] prior juvenile adjudication may be an element of the weapons-under-disability offense set forth in R.C. 2923.13(A)(2) without violating due process under the Ohio or United States Constitutions." *State v. Carnes*, 2018-Ohio-3256, ¶ 21.

### 1. Duration of disarmament

{¶ 65} Courts applying the *Bruen*/*Rahimi* framework to disarmament provisions such as 18 U.S.C. 922(g)(1) and R.C. 2923.13 have contemplated the question of whether indefinite or permanent disarmament is permitted under the Second Amendment. The United States Supreme Court has not yet squarely addressed this question; the firearm prohibition at issue in *Rahimi* was temporary because it lasted only while an individual was subject to a restraining order. *Rahimi*, 602 U.S. at 699. In a concurring opinion, Justice Gorsuch expressly asserted that the Court was not deciding "whether the government may disarm an individual permanently." *Id.* at 713.

{¶ 66} Federal courts have reached different conclusions on this issue when considering challenges to 18 U.S.C. 922(g)(1). The Sixth Circuit appears to have concluded that a law providing for permanent or indefinite disarmament is constitutional if individuals have an opportunity to demonstrate that the disarmament provision should not apply to them. The court stated in *Williams* that "history reveals that legislatures may disarm groups of people, like felons, whom the legislature believes to be dangerous—so long as each member of that disarmed group has an opportunity to make an individualized showing that he himself is not actually dangerous."[11] *Williams*, 113 F.4th at 663. Some federal courts, such as the Tenth Circuit Court of Appeals, have concluded that imposing

---

[11] The *Williams* decision noted that 18 U.S.C. 922(g)(1) "doesn't provide a mechanism allowing individuals to prove the class-wide presumption [of dangerousness] shouldn't apply to them." *Williams* at 657. However, the court concluded that "[w]hen a disarmament statute doesn't provide an administrative scheme for individualized exceptions, as-applied challenges provide a mechanism for courts to make individualized dangerousness determinations." *Id.* at 661. The court also noted that under 18 U.S.C. 925(c) the Bureau of Alcohol, Tobacco, and Firearms was empowered to authorize a person with a felony conviction to possess a gun if he showed that he would not be likely to act in a manner dangerous to the public safety and that the public interest supported rearmament. *Id.* Notwithstanding that statutory provision, however, the court further noted that Congress had refused to fund the program and therefore it remained "practically unavailable" as a route to reclaim the right to possess a firearm. *Id.*

permanent disarmament as a punishment for a felony offense is consistent with the nation's history and tradition, particularly for offenses that would have been defined as felonies at the Founding era and would have been subject to serious penalties, including death, at that time. *See Diaz* at 116 F.4th at 469-70 ("At [the Founding], at least one of the predicate crimes that Diaz's § 922(g)(1) conviction relies on—theft—was a felony and thus would have led to capital punishment or estate forfeiture. Disarming Diaz fits within this tradition of serious and permanent punishment."). Other federal courts, such as the Third Circuit Court of Appeals, have reached the opposite conclusion, holding that a Founding-era practice of imposing capital punishment for certain felony offenses does not establish a historical tradition of permanent or indefinite disarmament. *See Range v. Atty. Gen., United States*, 124 F.4th 218, 231 (3d Cir. 2024) (Emphasis in original.) ("Yet the Founding-era practice of punishing some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue here—de facto lifetime disarmament for all felonies and felony-equivalent misdemeanors—is rooted in our Nation's history and tradition."). Thus, the question of whether permanent or indefinite disarmament is permitted under the Second Amendment is an open issue among federal courts.

{¶ 67} Ohio's courts have similarly reached different conclusions about permanent or indefinite disarmament under R.C. 2923.13. In *Thacker*, the First District Court of Appeals held that a dangerousness-based disarmament may last as long as the danger it seeks to prevent, but also appeared to agree with the Sixth Circuit's conclusion in *Williams* that permanent disarmament may be permissible if an individual has the opportunity to remove the disability based on his particular circumstances. *Thacker*, 2024-Ohio-5835, at ¶ 51, 53 (1st Dist.). The *Thacker* decision held that R.C. 2923.13 was unconstitutional as applied to the defendant because he had been previously convicted of a nonviolent felony and the law presumptively disarmed him for life subject to discretionary relief under R.C. 2923.14. *Thacker* at ¶ 105. By contrast, the Eighth District Court of Appeals concluded that R.C. 2923.13(A)(2) "fits squarely within the 'temporary' holding of the *Rahimi* Court because R.C. 2923.13(A)(2) allows an individual to apply for relief from [the prohibition on having weapons] pursuant to R.C. 2923.14." *King*, 2024-Ohio-4585, at ¶ 32 (8th Dist.). Similarly, the Fifth District Court of Appeals and the Sixth District Court of Appeals have noted that R.C. 2923.14 provides individuals with an opportunity to regain their firearm

rights. *See Skaggs*, 2024-Ohio-4781, at ¶ 28 (5th Dist.) ("Ohio's ban on possession of a firearm by a person convicted of a felony drug offense is not necessarily a lifetime ban, as R.C. 2923.14 allows a person to seek relief from weapons disability under certain circumstances."); *Hodges*, 2025-Ohio-5448, ¶ 21, fn. 3 (6th Dist.) (noting that R.C. 2923.14 provides a route for regaining firearm rights by demonstrating compliance with the requirements of the statute).

{¶ 68} We acknowledge the *Thacker* majority's concerns about the possibility of permanent disarmament arising from a juvenile delinquency adjudication. *See Thacker* at ¶ 89-104. However, *Thacker* involved only a violation of R.C. 2923.13(A)(3) based on a juvenile delinquency adjudication for a *nonviolent* drug offense. In the present case, Thompson was adjudicated delinquent on multiple occasions for acts that would have constituted felony offenses of violence if committed by an adult. Additionally, the adjudications in *Thacker* occurred more than a decade before the weapon under disability charge, whereas in this case the offense leading to the charge in case No. 23CR-656 occurred just a few years after the juvenile delinquency adjudications. Further, we agree with the courts that have concluded that disarmament under R.C. 2923.13 is not necessarily permanent because Ohio law provides individuals with a method to petition for relief from a prohibition on possessing firearms.[12] Under R.C. 2923.14(A)(1), with limited exceptions, "any person who is prohibited from acquiring, having, carrying, or using firearms may apply to the court of common pleas in the county in which the person resides for relief from such prohibition." The statute further sets forth the conditions under which relief from the disability can be granted:

> Upon hearing, the court may grant the applicant relief pursuant to this section, if all of the following apply:
>
> (1) One of the following applies:
>
> (a) If the disability is based upon an indictment, a conviction, or an adjudication, the applicant has been fully discharged from imprisonment, community control, post-release control,

---

[12] In addition to Ohio's statutory method for petitioning for removal of a weapons disability, we note that the Sixth Circuit's *Williams* decision suggested that an as-applied constitutional challenge affords a challenger the opportunity to demonstrate that a class-wide presumption of dangerousness should not apply to him. *See Williams*, 113 F.4th at 657-58.

and parole, or, if the applicant is under indictment, has been released on bail or recognizance.

(b) If the disability is based upon a factor other than an indictment, a conviction, or an adjudication, that factor no longer is applicable to the applicant.

(2) The applicant has led a law-abiding life since discharge or release, and appears likely to continue to do so.

(3) The applicant is not otherwise prohibited by law from acquiring, having, or using firearms

R.C. 2923.14(D). "Relief from disability granted pursuant to [R.C. 2923.14] restores the applicant to all civil firearm rights to the full extent enjoyed by any citizen," subject to limited conditions. R.C. 2923.14(F). Those conditions include potential revocation by the trial court "for good cause shown and upon notice to the applicant." R.C. 2923.14(F)(3).

{¶ 69} There is nothing in the record in this case indicating that Thompson ever sought restoration of his right to possess a firearm under R.C. 2923.14. Thompson's juvenile delinquency adjudication for an act of robbery was issued when he was 13 years old and his juvenile delinquency adjudication for an act of aggravated robbery was issued when he was 14 years old. The discovery of a firearm in Thompson's home that led to the charge in case No. 23CR-656 occurred when Thompson was 18 years old. Under these circumstances, we cannot conclude that it is a violation of the Second Amendment to prohibit Thompson from possessing a firearm five years after his first juvenile delinquency adjudication for an act that would have constituted a violent felony offense if committed by an adult.

### 2. Constitutionality of R.C. 2923.13(A)(2) as applied to Thompson

{¶ 70} Under the circumstances presented in this case, we conclude that R.C. 2923.13(A)(2), as applied to Thompson, is consistent with the nation's history and tradition of firearm regulations and does not violate the Second Amendment.[13] Therefore,

---

[13] Thompson did not assert a violation of his right to bear arms under Article I, Section 4 of the Ohio Constitution. Accordingly, we do not address whether R.C. 2923.13(A)(2) or (A)(3) violates the right to bear arms guaranteed by the Ohio Constitution. We note the conclusion of the First District Court of Appeals that "Ohio courts have long interpreted the arms-bearing provision in our own constitution as distinct from the analogous federal provision" and that *Bruen* did not alter the binding interpretation of the Ohio Constitution

the trial court did not err by denying Thompson's motion to dismiss the indictment to the extent it charged him with violating R.C. 2923.13(A)(2).

### b. Prohibition on firearm possession based on juvenile adjudication for an act that would have constituted aggravated possession of drugs

{¶ 71} As explained above, the indictment in case No. 23CR-656 also alleged conduct constituting a violation of R.C. 2923.13(A)(3)—i.e., possessing a firearm while having been previously adjudicated a delinquent juvenile for committing an act that would have constituted the felony offense of aggravated possession of drugs if committed by an adult. Thompson's motion to dismiss also challenged the constitutionality of that portion of the statute. However, under the doctrine of constitutional avoidance, a court will not reach constitutional issues unless absolutely necessary. *See State v. Talty*, 2004-Ohio-4888, ¶ 9; *State v. Baker*, 2024-Ohio-5990, ¶ 55 (10th Dist.). Therefore, having concluded that the trial court did not err by denying Thompson's motion to dismiss because R.C. 2923.13(A)(2), as applied to him, did not violate the Second Amendment, we decline to address the constitutionality of R.C. 2923.13(A)(3) as applied to Thompson.

{¶ 72} The trial court did not err by denying Thompson's motion to dismiss the indictment and did not err by finding Thompson guilty pursuant to his subsequent no-contest plea. Accordingly, we overrule Thompson's second assignment of error.

## IV. CONCLUSION

{¶ 73} For the foregoing reasons, we overrule Thompson's two assignments of error and affirm the judgments of the Franklin County Court of Common Pleas.

*Judgments affirmed.*

JAMISON and LELAND, JJ., concur.

————————————

set forth in decisions of the Supreme Court of Ohio. *State v. Hall*, 2025-Ohio-1644, ¶ 112 (1st Dist.). The *Hall* decision referred to the Supreme Court of Ohio's decision in *Klein v. Leis*, 2003-Ohio-4779, which applied the police-power test when evaluating a challenge under the Ohio Constitution to the state's concealed carry law. *See id.*, citing *Klein* at ¶ 15. *Compare Skaggs*, 2024-Ohio-4781, at ¶ 73-92 (5th Dist.) (King, J., dissenting) (arguing that a history-and-tradition-based analysis supports a conclusion that R.C. 2923.13(A)(3) violates Article I, Section 4 of the Ohio Constitution).